UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Bernadette Freeman, *Plaintiff*, v. Frank Bisignano, Commissioner of the Social Security Administration, *Defendant* | No. 23 CV 4374 Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Bernadette Freeman is an African American woman who worked as an Administrative Law Judge ("ALJ") for the Social Security Administration ("SSA"). She resides in Chicago and in 2017, accepted a position at SSA's Oak Brook office. Freeman's health conditions, which include low vision and an autoimmune disorder, made it difficult for her to drive safely in the dark. Freeman requested a transfer to the downtown Chicago office as a reasonable accommodation, but the request was denied. Freeman was, however, permitted to intermittently telework under SSA's telework program until early 2019 when she violated the agency's Personally Identifiable Information ("PII") policy. Freeman ultimately retired in late December 2019.

Freeman brings disability discrimination claims against SSA under the Americans with Disabilities Act (Count I) and the Rehabilitation Act (Count II) as well as Title VII race discrimination (Count III) and unlawful retaliation claims (Count IV). [Dkt. 1.][1] Before the court is SSA's motion for summary judgment. [Dkt. 35.] For the following reasons, the motion is granted.

**I.  Local Rule 56.1**

"On summary judgment, the court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires the moving party to file a statement of material facts with citations to specific supporting evidence in the record. L.R. 56.1(a)(2); *see also* L.R. 56.1(d). The opposing party must then respond to each fact by either admitting it or disputing it with its own supporting evidence. L.R. 56.1(b)(2); *see also* L.R. 56.1(e). The non-moving party may also file additional facts supporting its position, L.R. 56.1(b)(3), subject to the

---

[1]  Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

same rules that governed the moving party's statement of facts. No Local Rule 56.1 submission may contain legal argument, except responses, which may raise objections, "including objections based on admissibility, materiality, or absence of evidentiary support." L.R. 56.1(d)(4), (e)(2).

The court maintains discretion to require strict compliance with Local Rule 56.1. *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023). It addresses the parties' major evidentiary objections before turning to the facts of the case.

### A. Compliance with the Local Rules

Freeman asks the court to disregard paragraphs 39 through 79 of SSA's Local Rule 56.1(d) statement because the SSA "shoe-horned multiple facts" into its numbered statements and thus exhausted its allowance of 80 factual statements by paragraph 38. [Dkt. 49 at 1.] It's true that under Local Rule 56.1(d)(1), a statement of material facts "must consist of concise numbered paragraphs," but the court declines to strike the statements. As the rule itself makes clear, there is no "categorical prohibition of paragraphs containing multiple sentences or multiple facts." *Jackson v. City of Chi.*, 2024 WL 1142015, at *2 n.1 (Mar. 15, 2024). When the SSA includes multiple facts per paragraph, those facts "are logically grouped and the combinations make sense in context." *Maher v. Rowen Grp., Inc.*, 2015 WL 273315, at *7 (N.D. Ill. Jan. 20, 2015). Ultimately, the court prefers to decide the case on the merits, and Freeman had the opportunity to respond to SSA's statement of additional facts and did so. [Dkt. 49.]

\* \* \* \* \*

Local Rule 7.1 provides that no brief may exceed fifteen pages without prior approval of the court. Nevertheless, Freeman's brief spans twenty-five pages, and she did not seek leave to file a brief that long. [Dkt. 48.] The court could strike the brief as the rule allows, but as noted, it prefers to decide the case on the merits.

Still, the court disregards facts Freeman asserts for the first time in her response brief. As noted below, when Freeman cites facts or exhibits not contained in her Local Rule 56.1 statement of additional facts, the court has not considered them. *See, e.g.*, *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 631 F. Supp. 2d 1010, 1017 (N.D. Ill. 2009) ("[T]he Court disregards any additional statements of fact contained in a party's briefs but not in its fact statements."); *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (explaining that Rule 56.1 "provides the only acceptable means of … presenting additional facts").

B.  Admissibility

Paragraph 12 of Freeman's statement of additional facts relates to the absence of an SSA policy mandating a written reprimand for employees who send emails with PII to a personal email account. [Dkt. 54, ¶ 12.] Specifically, Paragraph 12 asserts that in a 2021 arbitration action between SSA and the ALJ union, (1) for over 75% of the considered instances involving first-time PII policy violations by ALJs, counseling was either the only disciplinary action imposed or a written reprimand was given only after counseling, and (2) no ALJ had received a written reprimand for an inadvertent, first-time PII violation. [*Id.*] In support, Freeman cites to an arbitration order issued in 2021 in *Soc. Sec. Admin. v. Ass'n of Admin. L. Judges*, No. 201202-01853 (Fed. Mediation and Conciliation Serv. 2021) (Diekemper, Arb.), referred to as Exhibit 9, together with five tables filed by the ALJ union in that action, summarizing and comparing the outcomes of various PII violations by ALJs between February 2017 and July 2019. [*Id.*; *see* Dkt. 48-1 at 121–55.]

The arbitration order itself does not cite the statistic Freeman relies on. It merely references the fact that the ALJ union provided the tables with its brief. [Dkt. 48-1 at 143 ("Tables 1 through 5 attached to the Brief contained more detailed comparisons of cases involving counselings and [Official Reprimands] and surrounding circumstances.")]

SSA argues that most of the asserted facts in paragraph 12, including the tables included in Freeman's Exhibit 9, are excludable hearsay and lack proper foundation.

The court agrees that the tables Freeman cites are offered for their truth, and out-of-court statements offered to prove the truth of the matter asserted are hearsay and inadmissible unless an exception applies. *See* Fed. R. Evid. 801(c), (d). "Inadmissible hearsay evidence does not create a factual dispute at summary judgment." *Wash. Cnty. Water Co. v. City of Sparta*, 77 F.4th 519, 529 (7th Cir. 2023) (citation omitted).

The tables are also excludable for lack of foundation. They provide no indication of who created them, what information was used to create them, or where that information came from. To defeat summary judgment, Freeman may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (evidence relied upon must be of a type that would be admissible at trial). And while it is true that summaries may be admissible to prove the contents of voluminous records, this is so only when "the proponent has made the originals … available for examination or copying," Fed. R. Evid. 1006, so that the opposing party may check the accuracy of the summary. *Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512, 523 (7th Cir. 1983). Freeman has not done so here, so the tables are excluded for this reason, too.

3

In an attempt to salvage the tables, Freeman moves to supplement her summary judgment submission with a declaration from a previously undisclosed witness: Daniel Benjamin, a former National Grievance Chair for the ALJ union. The declaration attempts to lay a foundation for the tables by explaining what information was relied upon to produce the tables and how it was gathered. [Dkt. 55.]

There is no dispute that Freeman produced the declaration after the close of fact discovery and after summary judgment briefing concluded. If a party fails to comply with its disclosure obligations under Rule 26(a) or (e), Rule 37(c) generally prohibits the party from using that information "to supply evidence on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c)(1). The sanction of exclusion is "automatic and mandatory" unless the party can show that its violation was substantially justified or harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *see id.* District courts have broad discretion to determine whether a violation of Rule 26(a) or (e) is substantially justified or harmless. *Id.* The following factors guide district courts when making Rule 37 determinations: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019).

Freeman makes no attempt to explain why Daniel Benjamin, the declarant, was not disclosed during fact discovery. She states only that she was "surprised by Defendant's objections to the facts asserted in ¶ 12" since SSA was a party to the underlying arbitration. [Dkt. 55 at, ¶ 6.] Even if SSA's objection to the tables came as a surprise to Freeman, she has not shown that her non-disclosure of the declaration was justified or harmless. For starters, Freeman herself produced the tables during fact discovery and had ample time to disclose a witness with knowledge of their authenticity and foundation. She did not do so.

Nor is the non-disclosure harmless or curable at this stage of the litigation. SSA was deprived of the chance to depose Benjamin, review the documents he cites, or test the accuracy and completeness of his analysis. "[A]llowing the evidence now would be inconsistent with the spirit of Local Rule 56.1." *Dyson, Inc. v. Sharkninja Operating LLC*, 259 F. Supp. 3d 816, 828 (N.D. Ill. 2017). In any event, the declaration is no substitute for providing the records that underlie the tables, which Freeman has not done. The court therefore denies Freeman's motion to amend and excludes the tables from consideration at summary judgment.

## II. Background

The court draws on the parties' Local Rule 56.1 statements to summarize the facts. [Dkts. 49, 54.] Unless noted, the facts below are undisputed either because the parties agree or based on a party's failure to properly cite evidence refuting the asserted fact as required by Local Rule 56.1. The court only relays facts that are

4

material—that is, "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And it presents them in the light most favorable to Freeman as the non-moving party. *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023).

### A. Assignment to Oak Brook

In 2016, Freeman began working as an ALJ in New Jersey, *see* dkt. 49, ¶ 1, though she maintained a permanent residence in Chicago. [Dkt. 54, ¶ 2.] In October 2017, after the death of her grandson and husband, Freeman transferred to SSA's office in Oak Brook located approximately 20 miles from downtown Chicago. [Dkt. 49, ¶ 8.] Freeman accepted the transfer to Oak Brook after her request for a temporary 120-day hardship transfer to Chicago was denied because no positions were open in Chicago at the time. [*Id.*, ¶ 7.]

As an ALJ, Freeman's duties included "holding hearings and making and issuing decisions on appeals from determinations made in the course of administration of titles II, VIII, and XVI of the [Social Security] Act in conformity with the Administrative Procedure Act." [Dkt. 49, ¶ 4 (cleaned up).] Social Security claimants are entitled by regulation to request in-person hearings. [*Id.* (citing 20 C.F.R. §§ 404.936, 416.1436).] SSA has a telework program, and Freeman was permitted to telework under a written policy agreement she signed in October 2017. [Dkt. 49, ¶ 50.] Among other things, to be eligible for telework, an ALJ may not have any disciplinary action in the preceding twelve months and telework privileges could be rescinded if an employee is reprimanded or has violated SSA's PII policy. [*Id.*, ¶¶ 49–50.]

Once she transferred, Freeman continued to reside in Chicago, so the commute entailed a 45- to 60-minute drive each way. [Dkt. 49, ¶¶ 9–10.] SSA maintains that public transportation was a feasible commuting option; Freeman disagrees, noting that public transit would have entailed a considerably longer, more difficult option that raised safety issues.[2] [Dkt. 49, ¶ 10; Dkt. 54, ¶ 17.]

### B. Work Environment

At the Oak Brook office, Freeman's first-line supervisor was Hearing Office Chief ALJ Roxanne Kelsey, a white female, and her second-line supervisor was Regional Chief ALJ Sherry Thompson, an African American female. [Dkt. 49, ¶ 8.] All agree that on her first day, Freeman was not greeted by management, introduced to other staff, or onboarded. [Dkt. 49, ¶ 12; Dkt. 54, ¶ 20.] By contrast, in 2018,

---

[2] Neither party cites evidence to support its account of how far, long, or transfer-demanding a commute via public transit would take. [*See* Dkt. 49, ¶ 10; Dkt. 54, ¶ 17.]

5

management provided introductions, onboarding, and an orientation tour to a different, non-African American ALJ on her first day. [*Id.*]

For the first two months, Freeman was not provided with access codes to the building, which, at times, left her waiting for up to thirty minutes in a public area to gain access to the building. [Dkt. 49, ¶ 14.] SSA asserts that Freeman was given card access within two months of her arrival, but it admits that she continued to experience ongoing difficulty with her access codes well into 2018. According to Freeman, it was four to six months before the codes began working properly. [*Id.*, ¶ 15.] Freeman never received a key to her personal office and claims that "all her peers" had keys to their offices. [*Id.*, ¶¶ 16–17.] SSA asserts that non-supervisory ALJs were not issued or permitted to retain office keys.

Freeman maintains that for roughly her first year in Oak Brook, her first line supervisor Kelsey made racially insensitive, offensive, and disparaging comments. Freeman recalls an early occasion when Kelsey asked Freeman how she was adjusting to the office in a "harsh and disrespectful tone" that to Freeman, suggested racial animus. [*Id.*, ¶ 13.] On another occasion in December 2017, during a meeting for judges and attorneys, Kelsey's response to a question presented "Freeman [as] a hypothetical janitor." [Dkt. 49, ¶ 18.] Because she was the only African American judge present, Freeman considered this a racial insult. [*Id.*]

In January 2018, Kelsey suggested that Freeman "make a presentation to the employees on race and racism, as if Judge Freeman as an African American is a spokesperson for her race." [Dkt. 54, ¶ 25(c).] Freeman declined by advising Kelsey that "she would not be speaking on race or racism to the Oakbrook employees." [*Id.*] The same month, Freeman delivered a presentation to attorneys on "best practices from [her] New Jersey assignment." [Dkt. 54, ¶ 25(d).] According to Freeman, Kelsey interrupted and contradicted her comments during the talk, something Freeman perceived as being done to portray her as incompetent. [Dkt. 49, ¶ 19; Dkt. 54, ¶ 25(d).]

Also in January 2018, Freeman reported to Kelsey that James Schafer, a non-supervisory staff member, was engaging in race-based harassment towards Freeman, including through "comments directed solely to Freeman's race." [*Id.*, ¶ 25(b).] This included comments like "it's a shame the way President Trump treats African-Americans, I feel so sorry for you people" and that "Black people are really smart," followed by a reference to a magazine article "about a young black girl who read over 100 books" in a short period of time. [Dkt. 49, ¶ 21.] According to Freeman, Schafer's harassing and aggressive behavior continued until he retired. [Dkt. 54, ¶ 25(b)]. Freeman says that Kelsey attempted to excuse Schafer's comments by telling Freeman she would "just have to work with" him, but it's undisputed that Kelsey spoke to the employee's supervisor in response to Freeman's complaint. [Dkt. 49, ¶ 21; Dkt. 36-1 at 246.]

In July 2018, Kelsey told Freeman she was required to use a different system (referred to be the parties as DWI) to communicate with writing staff, and could no longer use the old system Freeman had used since 2016. [Dkt. 54, ¶ 27.] According to Freeman, Kelsey did not require other, non-African American judges to switch to the DWI system. [*Id.*] In October 2018, Kelsey directed SSA's writing staff to delay working on Freeman's cases, resulting in a very low case closure rate for Freeman that month, something Freeman says jeopardized her telework privileges. [Dkt. 54, ¶ 25(g).] That same month, Kelsey falsely criticized Freeman for double-booking hearings. [*Id.*, ¶ 25(f).]

Kelsey frequently entered Freeman's office without knocking, approached Freeman from behind "without notice" and invaded her personal space, including by taking over Freeman's computer mouse without asking. [Dkt. 54, ¶ 26]. Every month, Kelsey reminded Freeman that if she did not meet her monthly hearing quota, her telework privileges would be suspended. [Dkt. 49, ¶¶ 22, 24.] It is undisputed that Freeman has no knowledge about whether Kelsey reminded other ALJs of this requirement. [*Id.*]

It is undisputed that in mid-2018, the agency conducted an efficiency analysis of ALJs with "outlier allowance rates," that is, "decisions issued that paid benefits that were well above or well below the national average." [*Id.*, ¶ 31.] According to SSA, Freeman's allowance rate was 87%, which was more than two standard deviations above the mean for ALJs in the country and the thirteenth highest rate in the agency at the time. [*Id.*] Following this, Freeman and eight other ALJs were selected for focused review, which entailed sending "targeted training and reference materials" to Freeman and others to address whether the selected ALJs were granting more benefits on average. [Dkt. 49, ¶¶ 31–32.] Freeman has no knowledge of who selected her to participate in the review, when, or how, though she believes it was due to her race and EEO activity. [*Id.*, ¶ 33.] She admits that neither Kelsey nor Regional Chief Thompson were involved in the decision. [*Id.*, ¶ 32.]

In late December 2018, the SSA received Freeman's first EEO complaint, which claimed non-sexual harassment, racially discriminatory disparate treatment, and a hostile work environment [Dkt. 49, ¶¶ 41, 77.][3]

---

[3] Freeman does not support her assertion that she "initiated" an EEO claim in September 2018 with competent evidence. In a sworn statement made in connection with her EEO claim, Freeman was asked whether the person who rescinded her telework privileges was aware of her EEO protected activity and if so how. Freeman responded that after she initiated her EEO claim, she spoke with counselors and harassment officers who then made notifications to the "Local Office and the Region," such that the relevant actors "knew or should have known of [the] protected EEO activity as early as September/October 2018." [Dkt. 36-1 at 451.] This is pure speculation, and speculation cannot create a genuine issue of fact to defeat summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

C.  **Reasonable Accommodation Request**

Freeman discussed her difficult commute with Kelsey, and by November 2018,[4] she filed a written accommodation request to either be transferred to the Chicago office or permitted to perform her Oak Brook work from the Chicago hearing office. [*Id.*, ¶¶ 56–57.] She also requested hazardous weather leave, which would have allowed her to work out of the Chicago hearing office during hazardous weather. The accommodation request identified "blind[ness] or low vision" and "diabetes" as her disabilities. [*Id.*]

Freeman was asked to, and eventually did, supplement the request with medical documentation, including a letter from her primary care physician, Dr. Elyse Esrig, who explained that Freeman's anxiety and loss of vision "impacts her ability to drive distances in the dark (early morning/late evening) hours" and that she is "extremely sensitive to distractions while driving, including noise and the absence of light." [*Id.*, ¶ 61.] At some point in January 2019, Freeman injured her ankle and submitted a letter from a physical therapist documenting this injury as part of her accommodation request. [*Id.*, ¶ 71.]

In February 2019, SSA's local delegated official Christopher Dillon recommended denying Freeman's accommodation request because the medical documentation provided did not establish that her request was necessary. [*Id.*, ¶ 64.] The following month, Tamara Stenzel officially denied Freeman's request on the same basis, adding that Freeman could avoid driving in the dark by using public transit and "flextime," meaning she could start her workday between 6:30 and 9:30 a.m., and end between 3 and 6 p.m. [*Id.*, ¶ 3, 65.]

Freeman sought reconsideration, submitting additional letters from a physician's assistant, and an ophthalmologist. [*Id.*, ¶ 66.] One letter described Freeman's general "difficulty with tasks requiring good distance vision" and "inability to see cars and barriers in her peripheral vision areas when driving," elaborating that they are exacerbated by low light conditions, and recommended reduced driving time. [*Id.*, ¶¶ 67–69.] Another letter explained that Freeman's idiopathic thrombocytopenia ("ITP") diagnosis, which can cause internal bleeding, meant that Freeman needed a work schedule that would permit her to attend medical appointments in Chicago. [*Id.*, ¶ 68.]

The request for reconsideration was denied. The denial explained that Freeman's physicians had not identified an inability to drive during full daylight hours and that her ankle injury did not constitute a disability. [*Id.*, ¶¶ 70–71.] The denial also noted that Freeman could take advantage of flextime to mitigate the

---

[4] The parties dispute when Freeman requested accommodation. Freeman says she first made the request within a week of her arrival to Oak Brook in October 2017, *see* dkt. 54, ¶ 5, but this dispute is immaterial.

difficulties of driving in the dark or request leave to attend specific medical appointments. [*Id.*, ¶ 70.]

### D. PII Policy Violation and Telework Recission

Many SSA employees have access to PII, which includes information about an individual that can be used to distinguish their identity, including social security numbers and dates of birth. [Dkt. 49, ¶ 42] Employees with access to this material sign an annual acknowledgment of their obligation not to disclose PII without authorization. [*Id.*, ¶ 43.] These acknowledgments included reminders that violations may result in disciplinary action. [*Id.*] SSA instructs employees not to send or forward PII to non-agency, non-secure email accounts. [*Id.*, ¶ 44.]

In October 2018, Freeman forwarded twenty one emails to and from Kelsey to her personal Gmail account. [*Id.*, ¶ 45.] Freeman admits that the emails contained unencrypted PII of about forty-five claimants, but she explains she sent the emails to document and prepare her EEO claims. Freeman "promptly deleted" the emails and did not distribute them any further. [Dkt. 49, ¶ 45; Dkt. 54, ¶ 10.]

A written reprimand is permitted but not required for PII violations. [*Id.*, ¶ 12; Dkt. 49, ¶ 47.] On February 5, 2019, Regional Chief Thompson issued Freeman a written reprimand for failure to safeguard PII. Thompson informed Freeman that her telework eligibility would be suspended for one year. [*Id.*, ¶ 48.] Freeman had no prior disciplinary actions. [Dkt. 54, ¶ 11.] Thompson also reprimanded and rescinded telework eligibility for four white ALJs under her supervision. [Dkt. 49, ¶ 51–52.]

### E. Family and Medical Leave Act Requests

Not long after her ankle injury, Freeman requested FMLA leave. [Dkt. 49, ¶ 27; Dkt. 54, ¶ 23.] While waiting for a decision, Freeman took paid sick leave for several weeks in February 2019. [Dkt 49, ¶ 28; Dkt. 54, ¶ 22.] Kelsey and an SSA administrative assistant repeatedly called, texted, and emailed Freeman, often during medical appointments, about work matters, something Freeman alleges interfered with her recovery. [Dkt. 54, ¶ 22.]

On April 10, 2019, Kelsey approved Freeman's FMLA leave through May 31, 2019. [Dkt. 49, ¶ 29.] She later received provisional approval for additional FMLA leave for eight hours of leave each week as leave without pay. [*Id.*]

Freeman retired on December 4, 2019. [Dkt. 49, ¶ 79.]

### III. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323

9

(1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The court construes the evidence in the light most favorable to the non-moving party, giving her the benefit of all reasonable inferences. *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

## IV. Analysis

### A. Disability Discrimination

Freeman brings disability discrimination claims under the ADA and the Rehabilitation Act (Counts I and II). The ADA claim fails at the outset because "the ADA does not apply to federal agencies," such as SSA. *Dyrek v. Garvey*, 334 F.3d 590, 597 (7th Cir. 2003) (citing 42 U.S.C. § 12111(5)(B)). Still, "the standards set out in the ADA are used in determining whether a violation of the Rehabilitation Act occurred in the employment context," *id.,* so the court first analyzes Freeman's claim that SSA failed to provide a reasonable accommodation for her disability. *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021).

The Rehabilitation Act "prohibits employers from discriminating against qualified individuals due to a disability." *Rowlands v. UPS*, 901 F.3d 792, 798 (7th Cir. 2018). The Act requires federal employers to reasonably accommodate the disabilities of their qualified employees. *Bourke v. Collins*, 142 F.4th 918, 922 (7th Cir. 2025).

A failure-to-accommodate claim requires a plaintiff to show (1) the employer knew of her disability, (2) she is an otherwise qualified individual, and (3) the employer failed to reasonably accommodate the disability. *Swain v. Wormuth*, 41 F.4th 892, 897 (7th Cir. 2022). In this case, there is no dispute as to the first two elements. Freeman's loss of vision and ITP diagnosis constitute disabilities, and she informed SSA of those disabilities. Freeman also does not dispute that SSA claimants are entitled to request in-person hearings, so to be a qualified individual, an ALJ must, to some degree, be physically present in their assigned office.

Turning to the third element, Freeman requested an accommodation to work at the Chicago office, either by being transferred there or by physically working there while keeping her Oak Brook docket. She asked for this accommodation because her vision disability made it dangerous and difficult to drive to and from Oak Brook in the dark. Likewise, her ITP diagnosis required more flexibility to attend important medical appointments with doctors who were located nearer to Chicago.

Though reassignment to a vacant position can be a reasonable accommodation, it's Freeman's burden to prove that there was, in fact, a vacancy available. *Severson*

*v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017) (finding an accommodation request for reassignment unreasonable where the plaintiff did not demonstrate vacant positions were available). Here, Freeman fails to do so. She presents no evidence that a position in Chicago was available when she requested the transfer, or at any time thereafter. An employer is not required to create a new position or strip a current job of its principal duties as an accommodation. *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 819 (7th Cir. 2004).

Freeman's arguments in response are non-starters. She argues that SSA fails to address whether her requested accommodation would impose undue hardship. But the burden falls on Freeman in the first instance to show that the accommodation was reasonable. A showing of undue burden by the employer is only triggered once Freeman meets this initial showing. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) (accommodation plaintiff sought was not reasonable "so GE isn't required to show the accommodation would create an undue hardship.")

Freeman also relies on *Equal Emp. Opportunity Comm'n v. Charter Commc'ns, LLC*, 75 F.4th 729, 740 (7th Cir. 2023) to argue that a jury could find SSA's decision to deny her request was unreasonable because her accommodation request involved her commute. The court does not agree.

As explained in *Charter*, "[e]mployers usually bear no responsibility for helping an employee with a disability commute to and from work." *Id.* (reversing summary judgment where a vision-impaired employee could not drive at night and requested a temporary, two-hour change to his shift while he tried to move closer to work). "An employee who has chosen to live far from the workplace or failed to take advantage of other reasonable options, including public transportation, will rarely if ever be entitled to an employer's help in remedying the problems." *Id.* at 741. If "a qualified individual's disability substantially interferes with his ability to get to work and attendance at work is an essential function, an employer may sometimes be required to provide a commute-related accommodation, if reasonable under the circumstances." *Id.* at 743. Ultimately, the Court in *Charter* concluded that a jury should decide whether a thirty-day modification to a work schedule while the employee tried to move closer to work was a reasonable accommodation. *Id.* at 742.

*Charter* is different than this case. Here, Stenzel denied Freeman's request to work from the Chicago office, noting that Freeman could avoid driving in the dark by using public transit and flextime. Freeman disagrees that public transit was a meaningful option, *see* dkt. 48 at 21, but even assuming she's right about that, she does not address, let alone genuinely dispute, that flextime was available such that she could arrive and leave the office during daylight hours. [Dkt. 49, ¶ 65.] More fundamentally, unlike the employee in *Charter*, Freeman did not seek to work from Chicago on a temporary basis while she sought to relocate closer to Oak Brook. She requested a permanent transfer to Chicago when there was no vacancy.

11

"That a plaintiff wants more or different accommodations does not make what he did receive unreasonable." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 962 (7th Cir. 2021). Nor is an employer "required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner Inc.,* 233 F.3d 1014, 1017 (7th Cir. 2000); *Bourke*, 142 F.4th at 922 ("An employer must only provide a reasonable accommodation, not a perfect one.")

On this record, even when viewed with the benefit of all inferences drawn in her favor, no reasonable jury could find SSA failed to accommodate a disability.

B. **Hostile Work Environment**

Freeman alleges a Title VII race based hostile work environment claim. Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII if it "intentionally relies in part" on an individual employee's membership in a protected class when making an adverse employment decision. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 659 (2020). "Subjecting an employee to a hostile work environment counts as an adverse action ('unlawful employment practice') within the meaning of Title VII's prohibition of race discrimination in 42 U.S.C. § 2000e-2(a)." *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019).

To state a triable claim, Freeman must supply evidence from which a reasonable jury could find that (1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016). Alleged harassment must be "'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863–64 (7th Cir. 2005) (quoting *Luckie v. Ameritech Corp.*, 839 F.3d 708, 713 (7th Cir. 2004)).

Regarding the first element, Freeman told Kelsey that Kelsey's comments and James Schafer's comments were offensive and demeaning, so a jury could find that she did not welcome them. *See Williams v. DeJoy*, 2025 WL 601212, at *2 (7th Cir. Feb. 25, 2025) ("[B]ecause Williams told the supervisors that the comments were demeaning, a jury could rationally find that she did not welcome them.")

On the second element, whether the harassment was based on her race, Freeman has identified statements from co-worker James Schafer during an encounter with him on January 17, 2018. Among other comments, Schafer told Freeman he "felt sorry for you people" and he gave Freeman a magazine article to

12

read "about a young black girl." [Dkt. 54, ¶ 25(b).] Viewed in her favor, there is some evidence that might lead a reasonable jury to conclude that Schafer's comments were based on Freeman's race.

A negligence standard applies to claims of hostile work environment based on coworker conduct: "the plaintiff must show that the employer has been negligent either in discovering or remedying the harassment." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (cleaned up). "An employer is not liable for co-worker harassment if, upon becoming aware of the situation, it took prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Equal Emp. Opportunity Comm'n v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 405 (7th Cir. 2024).

Here, it is undisputed that Kelsey spoke to Schafer's supervisor in response to Freeman's complaint. [Dkt. 49, ¶ 21.] But Freeman also maintains that Kelsey told Freeman she "would just have to work with him." [*Id.*] The court must credit that assertion at summary judgment, so Freeman has identified some evidence that racial harassment from a co-worker may have gone unaddressed sufficient to create a genuine issue of fact on employer negligence.

Freeman also points to racial hostility from Kelsey, who was Freeman's supervisor. If the harassment was carried out by her supervisor, then SSA is strictly liable for her harassment when that harassment culminates in a tangible employment action. *Vance,* 570 U.S. at 424. A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*; *Cole*, 838 F.3d at 898 (employers are strictly liable for supervisor harassment).

Freeman fails to connect Kelsey's conduct or her statements to race, however. The closest she comes is when Kelsey referred to Freeman as a hypothetical janitor during a meeting, something Freeman now labels as a "racially-charged slur." [Dkt. 48 at 24.] But there is no evidence in the record that anyone, including Kelsey, ever used a racial epithet. And the reference to a janitor, when analyzed in context, is not inherently racial, nor did the comment have a "racial character or purpose." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022).

Freeman cites to other comments from Kelsey, including Kelsey's request that Freeman present to other employees on topics of race and racism, something that caused Freeman to feel treated as "a spokesperson for her race." [Dkt. 54, ¶ 25(c).] But Freeman declined the request, and when she agreed to deliver a different presentation, Freeman explains only that Kelsey interrupted her, which had nothing to do with Freeman's race. [*Id.*, ¶ 25(d).]

13

More broadly, the court accepts as true that there were times when Freeman was made to feel disrespected and belittled, but again, she fails to establish that any of the conduct had a racial character or purpose. For example, she says (and the court credits) that she was not allowed to have a key to her personal office when others were, was denied a card to access the non-public area of the building for the first few months in Oak Brook, was not afforded a proper welcome on her first day when others were, was asked to use a different computer system than other ALJs, and was rescheduled to a different courtroom on multiple occasions. [Dkt. 49, ¶¶ 11–14, 16–17, 27, 37–38.]

However, "administrative annoyances like a lateral relocation…, reassignment to a cubicle, and being left off the staff directory for a few months do not form the basis for a hostile work environment." *Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023) (cleaned up). Freeman's experiences are similar. It is undisputed that she was not the only ALJ who was moved from her courtroom, and she generally does not dispute SSA's assertion that the courtroom shift was caused by camera connection issues and management-related problems in the reception area of the building. [Dkt. 49, ¶¶ 37–38.]

Nor does Freeman explain the connection between these events and race. While the connection "need not be explicit, there must be *some* connection." *Cole*, 838 F.3d at 897 (concluding that most of the alleged harassment encountered by plaintiff was not connected to his race—"there was almost no evidence of racial animus in the record: no hostile or ambiguous remarks, no racial slurs, nothing beyond the notable exception of the [discovery of a] noose and secondhand report of a racist sign posted somewhere, at some unknown time by some unknown person") (emphasis in original) (cleaned up).

The remaining incidents fare no better. Freeman does not know who selected her for the focused review or why. And although Freeman asserts that SSA punished her more harshly for the PII infraction because of her race, she fails to explain how.[5]

The final element to assess is whether the harassment was sufficiently severe or pervasive enough to amount to a hostile work environment. To determine whether the harassment was severe or pervasive enough to create a hostile work environment, the key question is whether the harassment "altered the conditions of … employment." *Vill. at Hamilton Pointe*, 102 F.4th at 401. The inquiry requires both a subjective and objective showing of hostility: "the environment must be one that a

---

[5] The court disregards Freeman's improper citation to EEO affidavits from other SSA employees regarding general workplace conditions for non-white staff at the Oak Brook office. [Dkt. 48, Exs. 5 and 28 (Mundy); Ex. 31 (LeDuc); Ex. 33 (Scoon); 34 (Terry).] These affidavits were not included in her L.R. 56.1 statement of additional fact. Even if the court had considered them, they do not appear to help Freeman's cause: Scoon, LeDuc, and Munday each responded that they never witnessed Kelsey harass Freeman. [Dkt. 48-1 at 102, 355 (Mundy); at 366 (LeDuc); at 372 (Scoon).]

14

reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). "Offhand comments, isolated incidents, and simple teasing" are insufficient to establish a hostile work environment claim. *Passananti v. Cook Cnty.*, 689 F.3d 655, 667 (7th Cir. 2012).

Courts consider "the frequency of the harassment, how offensive a reasonable person would find it, whether it is physically threatening or humiliating (rather than verbal abuse), whether it unreasonably interferes with the employee's work, and whether it is directed at the employee." *Scaife v. United States Dep't of Veterans Affairs*, 49 F.4th 1109, 1116 (7th Cir. 2022).

Freeman has not presented enough evidence to show that the conduct was sufficiently severe or pervasive. It's true, as discussed above, that a jury could conclude that Schafer and Freeman's interaction in January 2018 was based on Freeman's race. What is lacking, however, is "frequency and severity." *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024). Freeman points to no other instances of race-based interactions with Schafer, Kelsey, or anyone else. She states only that "harassment by James Shaefer continued until she left the Agency." [Dkt. 49, ¶ 21.] But she presents no concrete evidence to establish the frequency of the interactions, what other remarks were made, or how the incidents interfered with her ability to do her job. Absent such a showing, there's no evidence from which the jury could conclude that the encounter with Schafer was anything more than an isolated incident. *Hambrick*, 79 F.4th at 843 ("Nearly all [of plaintiff's] complaints relate to one-time, everyday work disagreements that took place over several years—and none of her complaints, considered in combination, were so severe or pervasive as to 'alter the conditions of [her] environment.'") That Schafer and Kelsey were rude or unprofessional, including by interrupting and contradicting Freeman in front of others, does not amount to a severe or pervasive environment that was based on Freeman's race. Freeman surely experienced working conditions that she found unpleasant, but unpleasant or unprofessional behavior cannot contribute to a hostile environment claim.

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver*, 3 F.4th at 938 (quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020)). On this record, Freeman has not come forward with evidence that would allow a fact finder to reasonably conclude that the conduct she identifies was either severe or pervasive. Her hostile work environment claim fails.

### C. Retaliation

Last, Freeman claims retaliation under Title VII. To prevail, she must prove (1) she engaged in activity protected by the statute, (2) she suffered an adverse

15

employment action, and (3) a causal link between the protected activity and the adverse action. *Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 705 (7th Cir. 2024).

First, filing an EEO complaint constitutes protected activity. *Formella v. Brennan*, 817 F.3d 503, 515 (7th Cir. 2016). Freeman filed an EEO claim in December 2018.[6]

To show adverse action, Freeman relies on a series of events in February 2019: (a) SSA suspended her telework privileges; (b) while Freeman was on leave following her ankle injury, Kelsey (or others acting at Kelsey's direction) called, e-mailed or texted Freeman several times a day something that "interfered with Freeman's medical recovery"; and (c) the approval of her FMLA request was delayed for nearly two months.[7] [Dkt. 48 at 25; Dkt. 49, ¶ 27, 29, 48; Dkt. 54, ¶ 22.]

In *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), the Supreme Court made clear that to pursue a claim of discrimination under Title VII, a plaintiff need only show "some harm respecting an identifiable term or condition of employment." *Id.* at 354–55. The threshold for adverse action in the retaliation context, however, is arguably lower: it requires only that "the action was serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 348 (cleaned up). Still, the action "must rise above trivial harms, such as petty slights or minor annoyances that often take place at work and that all employees experience." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 912 (7th Cir. 2022). The test is fact-based and dependent on context. *Id.* at 912.

The court need not decide whether any of the events Freeman identifies amount to adverse actions. It notes, however, that district courts have held that rescinding or suspending an approved telework schedule or refusing to allow an employee to engage in telework to which she is otherwise entitled may be adverse

---

[6] Freeman filed a second EEO claim alleging retaliation for race discrimination and harassment as well as disability discrimination in March 2019, which is after the adverse actions she identifies. [Dkt. 49, ¶ 24.] For SSA to have retaliated against Freeman based on the second EEO claim, it must have had knowledge of the second EEO claim, so the court does not consider the second submission any further. *Upchurch v. Indiana*, 146 F.4th 579, 589 (7th Cir. 2025) ("The decisionmaker for the relevant adverse action must know about the earlier protected activity for an inference of retaliation to attach.")

[7] Freeman also says that adverse action took the form of denied access to her work emails while on sick leave, but as explained, the court disregards facts asserted in Freeman's briefs but not her Local Rule 56.1 statements. *Wm. Wrigley Jr. Co.*, 631 F. Supp. 2d at 1017. To the extent she claims SSA took adverse action by refusing to allow her to use "statutory EEO duty time to prepare her subsequent EEO charges" under 29 C.F.R. § 1614.605(b), this argument is waived. Freeman makes this point in a single, conclusory sentence, from which the court cannot adequately glean what she intends to argue. [Dkt. 48 at 28; Dkt. 54, ¶ 25(i).] "Perfunctory and undeveloped arguments are waived." *McCottrell v. White*, 933 F.3d 651, 670 (7th Cir. 2019).

under *Muldrow*. *See Wilson v. Noem*, 2025 WL 1000666, at *22 (D.D.C. Apr. 3, 2025) (collecting cases); *Miller v. O'Malley*, 2024 WL 4240443, at *4 (N.D. Ill. Sept. 19, 2024) ("A reasonable factfinder could conclude that Miller's inability to telework transformed the terms and conditions of his work and left him 'worse off' than he would have been if didn't have to commute into the office every day.")

Assuming Freeman could show one or more adverse actions, she has not established causation. A retaliation claim in the Title VII context "demands but-for causation between the protected activity and the retaliation." *Xiong v. Board of Regents of University of Wisconsin System*, 62 F.4th 350, 355 (7th Cir. 2023) (cleaned up). To demonstrate a causal connection a plaintiff can rely on "circumstantial evidence, which may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (citation omitted). Regardless of the type of evidence presented, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Id.*

Here, Freeman relies on timing. No bright-line rule exists for showing a causal link, *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017), but "[t]he closer two events are, the more likely that the first caused the second." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (inference of causality permitted where employee was discharged immediately after handing his supervisor a note detailing allegations of discrimination). To draw the necessary inference of retaliation based on suspicious timing, the time period between the protected action and the alleged adverse action must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

The nearly two-month gap between Freeman's EEO filing and the events of February 2019 are simply too attenuated. *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 711 (7th Cir. 2002) (three-month interval did not raise inference of retaliatory intent). *Compare Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (period of five weeks between alleged retaliatory actions and protected activities disallowed an inference of causation based only on suspicious timing), *with Casna v. City of Loves Park,* 574 F.3d 420, 427 (7th Cir. 2009) (inference of causality permitted where supervisor recommended termination the day after an employee made a protected statement and employee was terminated three days later).

True, Freeman's telework privileges were suspended closer to five weeks after she filed her EEO claim. But even if this timing was close enough, "any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action." *Vavra*, 106 F.4th at 76. That is the case here.

17

The suspension of Freeman's telework privileges was not because Freeman filed an EEO claim, but because she violated the PII policy. No reasonable factfinder could conclude otherwise. It is undisputed that to be eligible for telework, an ALJ may not have any disciplinary action in the preceding twelve months, and that telework privileges could be rescinded for a PII violation. [Dkt. 49, ¶ 50.] Freeman admits she violated the policy, and she received a written reprimand for it in February 2019, suspending her ability to telework for one year. [*Id.*, ¶ 48.] In other words, SSA has come forward with a non-retaliatory reason for the telework suspension, and Freeman presents no evidence to rebut that.

Ultimately, "to reach a jury on his retaliation claims, the evidence must permit a reasonable jury to draw a causal link between [the protected activity] and the adverse actions underlying [the] claims." *Upchurch*, 146 F.4th at 587. Freeman offers reasons why she believes SSA was wrong, but even if SSA erred, pretext is "a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025) (cleaned up). Here, there is no evidence from which a reasonable factfinder could conclude that Freeman's EEO claim was the but-for cause of any adverse action, so the retaliation claim fails, too.

## V. Conclusion

The court grants SSA's motion for summary judgment.

Enter: 23-cv-4374
Date:   February 12, 2026

_____
Lindsay C. Jenkins